UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

MICHAEL WILSON                    *      CIVIL ACTION NO.  15-1416

VERSUS                            *      MAG. JUDGE KAREN L. HAYES

LIBERTY MUTUAL INSURANCE          *
COMPANY

## MEMORANDUM OPINION

With the consent of all parties, the District Court referred this matter to the undersigned

magistrate judge for the conduct of all further proceedings and the entry of judgment, 28 U.S.C. §

636(c).  Pursuant to the referral, a one day bench trial was held on May 16, 2016.  Following

delays for transcription of the proceeding and post-trial briefs, the matter is now before the court.

## Background

On March 26, 2013, Michael Wilson was the operator of a 2003 Chevrolet Silverado that

was stopped in traffic on Winnsboro Road, Monroe, Louisiana when it was struck from behind

by a 2006 Cadillac DTS operated by Patrick Williams.  As a result of the impact, Wilson suffered

physical injuries, physical pain and suffering, mental anguish and distress, medical expenses, and

anticipated loss of earnings.

After securing the $15,000 policy limits from the Cadillac's liability carrier, Wilson

asserted a claim on July 22, 2014, against his under/uninsured motorist carrier, Liberty Mutual

Insurance Company ("Liberty Mutual") to recover the balance of his damages.  On February 11,

2015, Liberty Mutual notified Wilson that it evaluated the case at $30,000.  Wilson disagreed

with that assessment, and on February 26, 2015, filed the instant suit against Liberty Mutual for damages, penalties, attorney's fees, and legal interest stemming from Liberty Mutual's arbitrary, capricious, and unreasonable failure to honor his claim.

Wilson commenced the suit against Liberty Mutual in the 4th Judicial District Court for the Parish of Ouachita, State of Louisiana.  On April 24, 2015, Liberty Mutual removed the case to federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.  (Notice of Removal).  Following completion of discovery, the matter was tried before the court, without a jury.

## Summary of Evidence[1]

### I.      The Accident and Wilson's Medical Treatment

1.

On March 26, 2013, Wilson was eastbound on Winnsboro Road when traffic in front of him came to a halt.  The car behind his, however, failed to stop in time.  The force of the impact caused Wilson's head to jerk or snap backward.  He also used his hand, which was positioned on the steering wheel, to brace himself and to absorb the brunt of the forward momentum.  (Tr. 95-96).[2]

2.

The next day, Wilson felt sore and made an appointment to see George Ronald Woods, M.D.  Wilson testified that he told Woods that both of his shoulders were ailing him.  (Tr. 97).  Woods, testifying via deposition, stated that at Wilson's initial visit on March 27, 2013, he

---

[1]  The following is a non-exhaustive collection of salient points adduced at trial.  However, the court considered all non-excluded evidence and testimony.

[2]  References to the trial transcript [doc. # 57] are abbreviated as "Tr.," followed by the applicable page number(s).

complained of upper back, neck, and left arm pain.  (Exh. 34, pg. 9).[3]  Woods' physical

examination focused on the cervical spine.  *Id*.  At that time, Wilson exhibited decreased:  range

of motion, flexion, extension, and lateral movements.  *Id*.  He demonstrated symptoms of

radiculopathy – pain down his left arm that went all the way into his left hand.  *Id*.  He also had

neuritis symptoms going from the neck into his arm.  *Id*.[4]  Woods' impression after the initial

visit was cervical spine strain.  *Id*., pg. 10.  However, x-rays of the cervical spine were essentially

normal.  *Id*., pg. 13.  Woods prescribed muscle relaxers, pain and anti-inflammatory medication,

plus physical therapy to the cervical spine, three times per week.  (Exh. 1).

3.

Wilson attended a few physical therapy sessions before returning to Dr. Woods on April

18, 2013.  *See* Exh. 34, pgs. 14-15.  At that time, Wilson complained of pain in his right neck,

with what appeared to be a lipoma on the left-side of his neck area.  *Id*.[5]  He also complained of

left arm pain.  *Id*.  Woods assumed that the left arm pain was the same radiating pain that Wilson

had complained of at the time of his initial visit.  *Id*., pgs. 15-16.

4.

Wilson continued with his physical therapy sessions, and returned to Dr. Woods on May

16 and 30, 2013.  (Exh. 34, pg. 16).  During those visits, Wilson complained of pain in the right

neck and right shoulder.  *Id*.  Because of the persistence of symptoms, Woods ordered an MRI of

---

[3]  Trial Exhibit is abbreviated as "Exh.," followed by the exhibit number.

[4]  Neuritis is inflamation of the nerve from the neck down into the arm.  *Id*., pg. 10.

[5]  A lipoma is a buildup of fatty tissue between the skin and muscle.  *Id*.  It is neither
caused by trauma, nor painful.  *Id*.

the cervical spine, refilled Wilson's medication, and continued physical therapy.  *Id*.; Exh. 1.

5.

On June 7, 2013, Wilson underwent an MRI of the cervical spine.  (Exh. 4).  The radiologist noted asymmetry at the C3-C4 level on the left side that suggested disc herniation.  *Id*.  There also was disc bulging at the C5-C6 level, with mild encroachment.  *Id*.  Woods explained the MRI results to Wilson at his next visit on June 20, 2013.  (Exh. 1).  He instructed Wilson to restart his physical therapy because he had not attended in awhile.  *Id*.  He also gave Wilson a cortisone pack.  *Id*.

6.

Wilson returned to Dr. Woods on July 11, 2013, with complaints of neck and right shoulder pain.  (Exh. 1).  Woods gave him an injection of Decadron-LA, and advised him to continue his physical therapy.  *Id*.  Woods last saw Wilson on July 25, 2013.  *Id*.  At that time, he still had some right neck pain, right trapezius pain, and right shoulder pain. *Id*.  Woods prescribed Ultram for pain, and referred Wilson to Douglas Coleman Brown, M.D., an orthopedist.  *Id*.  Wilson was supposed to return to see Dr. Woods, but never did.  *Id*., Exh. 34, pgs. 18-19.

7.

Between April 3 and July 25, 2013, Wilson attended at least 26 physical therapy sessions.  (Exh. 1).  Between March 27 and July 2013, Dr. Woods issued Wilson six prescriptions for Lortab, 40-counts each.  *Id*.

8.

Dr. Brown first saw Wilson, in connection with symptoms associated with the instant

accident, on August 9, 2013.  (Exh. 2; Tr. 8).[6]  Brown's assistant documented that Wilson presented with complaints of pain to the neck, right and left shoulder, plus right arm and hand numbness.  (Exh. 2).[7]  On August 8, 2013, Wilson completed a pain diagram form on which he noted that he was experiencing stabbing pain to the posterior, right-side of his neck, plus numbness in his right forearm and hand.  *Id*.

Upon examination, Dr. Brown noted that Wilson had areas of spasm in the right trapezius; unrestricted shoulder movement; some pain with deviation to the right; plus positive Tinel's and Phalen's signs.  *Id*.  Brown's initial impression was C-3, C-5 bulging discs on the left side; acute, persistent cervical strain on the right side; and bilateral carpal tunnel syndrome.  *Id*. Brown ordered an EMG/nerve conduction study and refilled Wilson's Lortab prescription, but noted that he would have to return to Dr. Woods to obtain further refills.  *Id*.  At trial, Brown characterized Woods' initial pain as a whiplash type injury.  (Tr. 9).

9.

Woods underwent an EMG/nerve conduction study on October 1, 2013.  (Exh. 3).  Rolf Morstead, M.D., interpreted the results.  *Id*.  According to patient history, Wilson had complaints of neck pain, radiating to the shoulders and down his arms.  *Id*.  Predominantly, symptoms were in the right arm.  *Id*.  The test showed no evidence of right or left cervical radiculopathy, focal nerve entrapment, or peripheral neuropathy.  *Id*.

---

[6]  Dr. Brown is an orthopedic surgeon with 39 years of experience.  (Tr. 6-7).  He previously performed a lumbar fusion surgery on Wilson in 1992.  (Tr. 37, 93-94).

[7]  Dr. Brown's records are not all in chronological order.  For example, page six memorializes an office visit from later in 2014 because it notes that Wilson underwent hemorrhoid surgery in June 2014.  Exh. 2.

10.

Wilson did not return to Dr. Brown until November 14, 2013.  (Exh. 2; Tr. 16-17).  At that time, he still complained of pain turning his head, with radiation to the extensor surface of both shoulders.  *Id*.  Brown's impression at that time was cervical stenosis, cervical radiculopathy, and cervical strain.  (Exh. 2).  At trial, Dr. Brown explained that, at that time, he thought that Wilson had a bad cervical strain that was slowly improving.  (Tr. 16-17).  He also thought that he had strained his shoulder somewhat, but the neck seemed to be the cause of most of the pain.  *Id*.  Brown started Wilson on Lyrica and fitted him with a home cervical traction set.  (Exh. 2).[8]  Brown did not prescribe anything for Wilson's shoulders.  (Tr. 53).  Wilson was supposed to return to Brown for a re-check in four weeks.  *Id*.

11.

Wilson, however, did not return to Dr. Brown until ten months later, on September 15, 2014.  (Exh. 2; Tr. 18).  There is no evidence that he took any prescription medication for his shoulders during this ten month interval.  (Tr. 53-54, 126).  On September 15, 2015, Dr. Brown noted that Wilson continued to complain of pain along the right superior shoulder.  (Exh. 2).  At that time, his neck pain had all but resolved.  *Id*.  All of his pain was to his right shoulder; he had no pain to the left.  *Id*.  Brown noted that Wilson had undergone hemorrhoid surgery in June 2014.  *Id*.

Upon examination, Wilson's left shoulder and arm were normal.  *Id*.  On the right side, however, he demonstrated pain and popping over the acromiclavicular joint and over the distal rotator cuff and biceps tendon.  *Id*.  X-rays of the cervical spine showed C5-6 calcification, C6-7

---

[8]  Lyrica is an anti-nerve pain medication.  (Tr. 53).

disk space narrowing, and right shoulder acromioclavicular spur formation, but intact rotator cuff space.  *Id*.  Brown diagnosed right shoulder rotator cuff tendinitis, biceps tendinitis, right shoulder acromioclavicular arthritis with subacromial impingement, and preexisting C3, C5, and C6 degenerative bulging disks with stability.  *Id*.  He prescribed a compound pain cream for Wilson to use on his right shoulder and the side of the neck.  *Id*.  He also prescribed Ultram for discomfort.  *Id*.  Brown scheduled Wilson for a right shoulder MRI.  *Id*.  He also restricted Wilson from performing heavy duty work with his hands, arms, heavy lifting, and turning.  *Id*.

12.

A September 22, 2014, MRI of Wilson's right shoulder revealed moderate arthritic changes in the AC joint that resulted in mild impingement.  (Exh. 2).

13.

Wilson returned to Dr. Brown on September 29, 2014.  (Exh. 2).  Brown again documented that Wilson's neck pain had stabilized.  *Id*.  Brown interpreted the right shoulder MRI as establishing marked osteoarthritic degenerative changes in the right acromioclavicular joint with subacromial impingement.  *Id*.  He opined  that Wilson's right shoulder MRI was consistent with a direct "jamming" type injury acquired while trying to brace oneself against the impact of a motor vehicle accident.  *Id*.  Physical examination was positive, *inter alia*, for adduction maneuver and overhead range of motion.  *Id*.  Brown diagnosed right shoulder post-traumatic progressive degenerative arthritis of the right acromioclavicular joint with subacromial impingement.  *Id*.  He recommended diagnostic shoulder arthroscopy and open distal clavicle excision to eliminate the rotator cuff impingement and to permit Wilson to work in a more pain-free fashion.  *Id*.  Brown's estimated charge for the procedure was $4,834.00.  *Id*.

14.

Pharmacy records establish that Wilson received a 30 day supply of the compounding

cream on three occasions: September 25, 2014, October 20, 2014, and April 22, 2015.  (Exh. 8).

Wilson testified that he received the cream on more than three occasions.  (Tr. 121-122).  He

admitted, however, that he used the cream for about nine months, i.e., until June 2015.  *Id*.

Wilson applied the cream daily, at night, after work.  (Tr. 102).  Dr. Brown explained that the

cream included pain relieving medicine, muscle relaxant and an anti-inflammatory.  (Tr. 17-18).

He likened the cream to a cortisone shot in the shoulder.  (Tr. 24).

15.

Wilson did not return to Dr. Brown until over one year later, on October 19, 2015.  (Exh.

2).  In the intervening period, he had not scheduled the right shoulder surgery.  *Id*.  Upon his

return, Brown noted that Wilson had been working full-time, but had developed pain in his *left*

shoulder.  *Id*.  Wilson's right shoulder was giving him little trouble at that time.  *Id*.  His most

significant complaint was a mass that had developed over the anterolateral aspect of the left,

upper shoulder in the anterior deltoid muscle.  *Id*.  On physical examination, Wilson exhibited

full passive motion of the shoulder.  *Id*.  Brown surmised that the mass on the left shoulder could

be a portion of the biceps tendon that had torn and rolled up.  *Id*.  Brown authorized Wilson to

continue to work, and scheduled a left shoulder MRI.  *Id*.

16.

A November 2, 2015, MRI of the left shoulder revealed a partial tear versus chronic

tendinosis of the biceps tendon; degenerative change of the inferior glenoid, with subcortical

glanglion cyst formation; palpable mass that corresponded to a lipoma; and moderate chronic

degenerative change of the AC joint.  (Exh. 2).

17.

Dr. Brown's file included two letters addressed to plaintiff's counsel, that were dated November 9 and December 7, 2015.  (Exh. 2).  The letters do not reference any new physical examinations.  *Id*.  However, Brown documented that the MRI of the left shoulder confirmed that the biceps tendon remained in place, but there were some signs of tendinosis and irritation of the tendon.  *Id*.  The rotator cuff was normal, but the acromioclavicular joint appeared to be degenerative.  *Id*.  Brown recommended left shoulder arthroscopy debridement of the joint with removal of the ganglia, subacromial decompression, distal clavicle excision, and probable biceps tenodesis and excision of the subcutaneous lipoma.  *Id*.  Brown gave Wilson Tylenol, and authorized him to continue with his existing work schedule.  *Id*.  He further noted that surgery would be scheduled as soon as it was approved.  *Id*.

18.

On February 4, 2016, Wilson was seen by orthopedist, Karl Bilderback, M.D., for an independent medical examination arranged by Liberty Mutual.  (Exhs, 9 and 33, pg. 5). Bilderback noted in his report that Wilson complained of bilateral shoulder pain, with significantly more pain in the shoulders than the neck.  (Exh. 9).  Wilson denied any distal numbness or tingling in the arms or hands.  *Id*.  He seemed to have more trouble with his left shoulder than his right.  *Id*.  Upon examination, Wilson exhibited a painless range of motion in the neck.  *Id*.  He had normal strength, *inter alia*, in his deltoids, biceps, and triceps.  *Id*.  There was no atrophy or fasciculations.  *Id*.  The bilateral shoulders showed normal muscle mass, with no evidence of atrophy.  *Id*.  His AC joints were mildly tender and somewhat enlarged,

bilaterally.  *Id*.

19.

On July 16, **2007**, Wilson had undergone an MRI of the right shoulder stemming from right shoulder pain/soreness following a May 15, 2007, motor vehicle accident.  (Exh. 6).  The radiologist noted moderate arthritic changes in the AC joint, with evidence of an impingement and associated tendonosis, but no significant rotator cuff tear.  *Id*.

II.     **Plaintiff's Testimony**

20.

Wilson is a self-employed home improvement contractor – an electrician by trade.  (Tr. 87).  He started his own business, which includes roofing, jacking houses, installing sheet rock, building, and framing.  (Tr. 90-91).  He does two to three jobs at a time, but would prefer to subcontract out the work.  *Id*.  Wilson did not miss any work as a result of the accident.  (Tr. 111).  Eighty percent of his work duties entail actual manual labor, whereas twenty percent is spent managing others.  (Tr. 112).

21.

Wilson testified that the physical therapy sessions did not help him.  (Tr. 99).  However the medication prescribed by Dr. Woods did.  *Id*.  He took the medication in the evenings after work.  *Id*.  Some mornings, Wilson would wake up feeling good, but a little stiff.  *Id*.  As the day progressed, however, his muscles would warm up and relax.  *Id*.  After the accident, he had some days that were better than others.  *Id*.  He tried to ease up on the heavy work.  (Tr. 100).

22.

The cream prescribed by Dr. Brown helped alleviate Wilson's pain and discomfort.  (Tr.

102-103).  Wilson stated that he needed the two shoulder surgeries.  (Tr. 103).  The pain was

limiting his ability to perform his job at 100 percent.  *Id*.  However, he intended to continue

working – the pain notwithstanding.  *Id*.  Although Wilson experiences ongoing pain, he has

been in continuous pain since 1992.  *Id*.  If the pain hurts too bad, then he pauses for a little bit,

before resuming work.  *Id*.  Wilson's shoulder pain varies, and occasionally flares up.  (Tr. 104).

He rated his pain as a seven or eight (presumably on a ten point scale).  *Id*.  He acknowledged,

however, that he has a high tolerance for pain.  *Id*.

23.

Wilson continues to hang sheet rock.  (Tr. 104).  He basically still does everything.  *Id*.

When his pain flares up, he does not make a beeline for the doctor, he simply endures it.  *Id*.  He

still totes bundles of shingles.  *Id*.  When his shoulder starts hurting, he does something else at

the worksite, like pick up trash.  *Id*.  In fact, two days before trial, Wilson carried bundles of

shingles up to the roof at a worksite.  (Tr. 105).  At the end of the work day, Wilson does not

have time to reflect on his shoulder pain because he is so tired that he simply goes to sleep.  (Tr.

105-106).  He no longer takes any medication in the evenings.  *Id*.

24.

Wilson conceded that he enjoyed the necessary funds to pay for his shoulder surgery(ies).

(Tr. 107-108).  He also was willing to pay for it, if he needed it.  *Id*.

25.

Wilson testified that he was unable to see Dr. Brown unless his attorney made an

appointment for him.  (Tr. 122-123).  He admitted, however, that his attorney never refused to

make him an appointment in response to any request by him to see a physician.  *Id*.

26.

Wilson did not recall experiencing a motor vehicle accident in 2007.  (Tr. 134).  In addition, he never had surgery to repair the impingement indicated on the 2007 MRI.  *Id*.  He also admitted that he was involved in two more motor vehicle accidents in December 2013 and in 2014.  (Tr. 142).

27.

At trial, Wilson appeared confused about Dr. Brown's recommendation in 2014 that he undergo right shoulder surgery.  (Tr. 136-137).  He reiterated that he could afford the surgery, and that he would undergo it, if necessary.  (Tr. 137).  He added, however, that his attorney never sent payment to the physician so the surgery could be scheduled.  (Tr. 137-138).

III.    **The Physicians' Impressions**

28.

Dr. Woods did not see Wilson again after July 25, 2013.  (Exh. 34, pg. 18-19).  Thus, at his December 9, 2015, trial deposition, Woods had no idea how Wilson was doing.  *Id*.  Woods opined that, assuming Wilson had no past history of cervical injury, then Wilson's cervical complaints were related to the accident at issue.  *Id*., pgs. 19-20.  Woods deferred to Dr. Brown regarding causation and treatment of the orthopedic injuries.  *Id*.

29.

Dr. Brown testified that the ligament in front of Wilson's cervical disc probably stretched when his neck snapped in the collision.  (Tr. 36).  As a result, the body tried to heal the area by stiffening the area with calcium deposits.  *Id*.

30.

At trial, Dr. Brown vacillated on the cause of plaintiff's shoulder impairments.  He testified that he thought Wilson had sprains of both shoulders, and that the neck nerve irritation masked the shoulder pain.  (Tr. 20).  He opined that someone with a right shoulder like Wilson's would experience trouble climbing ladders and working at chest level or higher.  (Tr. 24-25). Brown stated that the big lump on the front of Wilson's left shoulder was probably unrelated to the accident.  (Tr. 27).  Brown *thought* that the biceps tear on Wilson's left arm was caused by the accident.  (Tr. 29).  He planned to do the left shoulder surgery first, and then after three to six months, perform surgery on the right shoulder.  (Tr. 33).  Success rate for the surgery is very high.  (Tr. 34).  However, surgery would render the shoulder about ten percent weaker than normal.  *Id*.

31.

On cross-examination, Dr. Brown agreed that by November 2013, Wilson's neck had become asymptomatic.  (Tr. 51).[9]  The proposed right shoulder surgery would repair the impingement and bone spurs that preexisted the accident.  (Tr. 61-62).  On cross-examination he could not say that the impingement and tendinosis on the right shoulder were related to the subject accident.  (Tr. 62).  Furthermore, given the lack of treatment for left shoulder pain in the intervening 31 months since the accident, Dr. Brown conceded that it was difficult to relate the left shoulder symptoms to the accident.  (Tr. 65-66).  He added, however, that the trauma from the subject accident probably aggravated the degenerative changes in Wilson's shoulders.  (Tr. 67-68).  Brown did not know whether Wilson would undergo right shoulder surgery; it depended

---

[9]  Albeit, he still experienced spasms from neck strain.  (Tr. 53).

on his tolerance level.  (Tr. 69-70).

32.

On re-direct, Dr. Brown stated that he manipulated Wilson's left shoulder at Wilson's initial visit, without complaint by Wilson.  (Tr. 81).  However, Wilson's Lortab prescription could have masked the pain.  *Id.*  Brown opined that the March 26, 2013, accident certainly caused the symptoms in Wilson's right shoulder, even though the MRIs showed little change. (Tr. 81-82).  He further opined that he *thought* that the accident started the biceps tendon tear in his left shoulder.  *Id.*  Brown also explained that trauma can make an underlying arthritic condition symptomatic.  *Id.*

33.

At his trial deposition, Dr. Bilderback opined that, as a result of the accident, Wilson suffered a cervical strain and some right shoulder subacromial impingement.  (Exh. 34, pgs. 14-15).  The MRI of the right shoulder allowed the inference of accident-related impingement.  *Id.*, pgs. 18-20.  However, he did not see any health care provider's findings prior to the accident where Wilson had complained of neck or shoulder pain.  *Id.*  He noted that trauma could cause inflammation that causes an arthritic condition to become symptomatic.  *Id.*, pg. 24.

Bilderback opined that Wilson's left-shoulder lipoma was not trauma-related.  *Id.*, pg. 50. He further stated that he thought that the recommended right-shoulder surgery was related to the accident, but the left shoulder surgery was not.  *Id.*, pg. 72.  He explained that the accident exacerbated Wilson's right shoulder arthritis.  (Tr. 75).  Before performing surgery, however, Bilderback first would administer a subacromial steroid injection, and if that alleviated his symptoms, then he would stop there.  *Id.*, pg. 73.  Bilderback further explained that if the

Page -14-

accident had exacerbated a preexisting condition on Wilson's left shoulder, he would have had

significant complaints earlier than two years post-accident. *Id.*, pg. 76.  In addition, the more

active someone is, the more likely it is that arthritis will become symptomatic. *Id.*, pg. 88.  In

sum, Bilderback concluded that the accident exacerbated Wilson's right shoulder, but not the left

shoulder. *Id.*, pg. 90.[10]

IV.     **Liberty Mutual's Administration of the Claim**

34.

Wilson, via counsel, initiated a claim with Liberty Mutual on July 22, 2014.  (Exh. 12).

On July 29, 2014, Liberty Mutual advised plaintiff that it needed various items of information.

(Exh. 13).  Plaintiff provided Liberty Mutual with itemized medical bills on August 11, 2014.

(Exh. 14).  On August 28, 2014, plaintiff provided Liberty Mutual with copies of the release and

payment from the tortfeasor's liability carrier.  (Exh. 15).

35.

On November 26, 2014, Liberty Mutual wrote to plaintiff's counsel requesting a copy of

the declarations page and UM rejection form for the vehicle that Wilson was riding in at the time

---

[10]  At minimum, plaintiff objected to the court's consideration of the unfavorable aspects
of Dr. Bilderback's opinion. *See* Tr. 85 and Pl. Post-Trial Memo.  In support of his argument,
plaintiff identified some 29 appellate decisions in which Dr. Bilderback served as an expert on
behalf of the defense or an insurance company. *See* Pl. Post-Trial Memo., pg. 19 n7.  Plaintiff
further emphasized that, in his review of the treatment records, Dr. Bilderback overlooked early
complaints of left shoulder pain.
       The court is not persuaded.  Dr. Bilderback demonstrated objectivity when he endorsed
plaintiff's right shoulder complaints.  Albeit, he apparently was not shown the findings from the
2007 MRI, which could have undermined his opinion relating the right shoulder impingement to
the accident.  In any event, Dr. Bilderback's report(s) and deposition testimony do not prove
material to the court's decision because the court reaches the same conclusion, even without
consideration of this evidence.

Page -15-

of the accident.  (Exh. 19).  Plaintiff provided Liberty Mutual with the requested information by February 9, 2015.  (Exhs. 21-22).

36.

On February 11, 2015, Liberty Mutual advised plaintiff that it had evaluated the case at $30,000, as Wilson apparently did not wish to proceed with shoulder surgery.  (Exhs. 23-24). After applicable offsets for funds already received, Liberty Mutual issued plaintiff a check for $10,000.  *Id*.

37.

Plaintiff's counsel wrote to Liberty Mutual on February 20, 2015, contesting the evaluation of the case, and further advising that Wilson intended to undergo the surgery, and thus, he, and the healthcare providers, needed assurance that Liberty Mutual would cover the cost of the procedure.  (Exh. 25).

38.

On March 12, 2015, Liberty Mutual's adjuster wrote to plaintiff's counsel explaining that she could evaluate the claim only based on Wilson's treatment incurred to date.  (Exh. 26).  She added:

> [w]e discussed Mr. Wilson's decision to get surgery on at least 2 occasions in December and January and you informed me that he had not committed to getting surgery done at that time.  As you are aware, we are unable to direct treatment. Therefore, I will be more than happy to re-evaluate this case if Mr. Wilson decides to get the surgery done.

*Id*.

Because of Wilson's continued pain, the adjuster tendered another $2,500.  (Exhs. 26-27).

39.

On September 17, 2015, defense counsel advised opposing counsel that Liberty Mutual had not received medical records establishing that Wilson had received any medical treatment in 2015.  (Exh. 28).

40.

On January 7, 2016, defense counsel wrote to plaintiff's counsel outlining the significant gaps in plaintiff's treatment.  (Exh. 29).  Consequently, Liberty Mutual asked plaintiff to submit to an independent medical examination.  *Id*.

41.

Plaintiff's counsel responded to defense counsel by letter dated January 11, 2016.  (Exh. 30).  He noted that the depositions of Drs. Woods and Brown had established that Wilson's injuries were caused by the accident.  (Exh. 30).  Counsel questioned the good faith of Liberty Mutual's tender, to date.  *Id*.  He further noted that his client had wanted to undergo the first surgery recommended by Dr. Brown in December 2015, during a work slowdown.  *Id*.  He explained that he had requested financial help from Liberty Mutual, but had received no response.  *Id*.

42.

Plaintiff's counsel reiterated his demands to defense counsel in a May 11, 2016, letter.  (Exh. 32).  At trial, however, the court sustained defendant's objection to the exhibit.  (Tr. 4-5).

**Findings of Fact**[11]

1.

The parties agree that Michael Wilson, who was not at fault, was rear-ended in a motor

---

[11]  Findings of Fact 1-20 incorporate the Parties' Joint Stipulations [doc. # 50].

vehicle accident on March 26, 2013, while operating a 2003 Chevrolet Silverado owned by

Yolanda Washington.  The tortfeasor was operating a 2006 Cadillac DTS, owned by Patrick

Williams, Sr.

2.

State Farm, which had issued a policy of liability insurance covering the 2006 Cadillac,

tendered policy limits of $15,000.  Neither the owner nor the driver of the Cadillac has any other

insurance available which would provide coverage for the claims asserted herein.

3.

At the time of the accident, there was in force and effect a policy of insurance issued by

defendant Liberty Mutual to plaintiff Michael Wilson which provides uninsured motorist

coverage with the policy limit of $100,000/$300,000.

4.

Michael Wilson received $1,000 in medical payments under State Farm Policy No.

161032718 issued to Yolanda Washington.

5.

Liberty Mutual made unconditional tenders of an additional $17,500.00, consisting of

$5,000 in MedPay and $12,500 in UM benefits, leaving $87,500 remaining on the Liberty

Mutual UM Policy limits.

6.

In total, Mr. Wilson has received $33,500 to date for all injuries related to this accident.

7.

Plaintiff filed a lawsuit in the 4th Judicial District Court of Ouachita Parish, Louisiana on

February 26, 2015.

8.

Defendant removed the state court proceedings to this court due to the existence of diversity jurisdiction.

9.

Michael Wilson first informed Liberty Mutual of the accident on July 22, 2014.

10.

Michael Wilson submitted a copy of his release agreement with Patrick Williams, Sr. to Liberty Mutual on August 28, 2014.  At that time, Michael Wilson also supplied Liberty Mutual with an affidavit of Patrick Williams, Sr. regarding the insurance coverage of the 2006 Cadillac.

11.

On September 8, 2014, Liberty Mutual made a medical payment of $1,966.00 to Glenwood Specialty Imaging.

12.

On September 18, 2014, Liberty Mutual made a medical payment of $308.81 to Professional Pharmacy.

13.

On December 1, 2014, Liberty Mutual made a medical payments unconditional tender of $2,725.19.

14.

Michael Wilson submitted Yolanda Washington's UM rejection form to Liberty Mutual on February 9, 2015.

15.

On February 11, 2015, Liberty Mutual made an UM unconditional tender of $10,000.00.

16.

Dr. Karl Bilderback examined Michael Wilson on February 4, 2016, at the request of Liberty Mutual Insurance Company.

17.

Liberty Mutual Insurance Company paid Dr. Bilderback $2,000 to perform the medical examination of February 4, 2016, and to supply Liberty Mutual with a medical report.

18.

Michael Wilson incurred $10,308.96 in medical treatment between March 27, 2013, and November 14, 2013.

19.

Wilson incurred $7,835.88 in medical treatment between September 15, 2014, and September 29, 2014.

20.

Wilson incurred $4,122.96 in medical treatment between October 19, 2015, and the present.

21.

The court finds by a preponderance of the evidence that, as a result of the March 26, 2013, accident, Wilson suffered a cervical strain and exacerbation of his preexisting right shoulder impingement and arthritis.  The cervical strain ultimately resulted in calcification of the affected area.  By September 2014, his neck symptoms had dissipated significantly, and his neck

was functioning well.  The abatement of Wilson's cervical symptoms permitted Wilson to focus

on his right shoulder aggravation.  He sought and received treatment for his right shoulder

symptoms for roughly a ten month period.  By October 2015, his focus had shifted to his left

shoulder.

22.

Plaintiff failed to establish by a preponderance of the evidence that his left shoulder (and

biceps) symptoms were caused or aggravated by the March 26, 2013, accident.  While he may

have complained of left shoulder or arm pain shortly after the accident, it did not become a

principal source of his complaints until over two and one-half years after the alleged precipitating

event.  Although Wilson stated that he overused his left shoulder to compensate for the injury to

his right side, there is evidence that his principal motivation for returning to Dr. Brown was

concern for the lipoma that had grown on his left arm.  All agree, however, that the lipoma was

not caused by the accident.

In short, Wilson's left shoulder symptoms simply are too remote in time from the

accident, considering the strenuous nature of Wilson's work.  Even at trial, at the points in his

testimony when he was able to relate Wilson's left shoulder symptoms to the accident, Dr.

Brown was not nearly as confident about the left shoulder as he was about the right shoulder.  In

fact, during cross-examination, he conceded that it was difficult to relate the left shoulder

symptoms to the accident.

23.

Although the March 26, 2013, accident caused Wilson's preexisting right shoulder

impingement to become symptomatic, the exacerbation proved temporary such that by June/July

Page -21-

2015 he no longer used or sought prescription medication for the condition.  In addition, his right shoulder condition did/does not prevent him from engaging in heavy work.  He continued to work throughout the relevant period, and even carried bundles of shingles onto a roof just two days before trial.  Albeit, Wilson rated his pain level at a seven or eight, he also emphasized that he has a high pain threshold, and has been in continuous pain (likely related to his lumbar spine) since 1992.  Because the 2007 MRI establishes that Wilson's right shoulder impingement and degenerative changes preexisted the accident, and because the exacerbation of symptoms alleviated in intensity with the passage of time and the use of cortisol cream, plaintiff did not establish by a preponderance of the evidence that the right shoulder surgery recommended by Dr. Brown is causally related to the accident at issue.

Even if he had, plaintiff did not establish that he would undergo the surgery.  Despite arguing that he could not schedule the surgery until approved by Liberty Mutual, he readily acknowledged that he possessed the resources to fund the surgery, and that he would undergo the procedure if necessary.  To date, however, plaintiff has not deemed it necessary to undergo the surgery.  Furthermore, his priority now is his left shoulder.

24.

The court awards past medical expenses in the total amount of $18,144.84.  Past medical expenses related to diagnosis and treatment of the left shoulder are not awarded.  In addition, no award is made for future medical expenses, lost wages or earning capacity.[12]  The court fixes general damages at $30,000 for all injuries causally related to the accident.  Of the $48,144.84 in

---

[12]  Plaintiff's counsel stated at trial that plaintiff was not pursuing a claim for lost income. (Tr. 141).

total damages sustained by plaintiff as a result of the subject accident, plaintiff has received

$16,000 in compensation from other sources, plus $17,500 in prior payments by Liberty Mutual.

Thus, the balance owed by Liberty Mutual is $14,644.84.

25.

The court finds that Liberty Mutual's unconditional tenders were made in good faith.  The

delayed onset of aggravating right shoulder symptoms, as well as the ten month gap between

treatment of the cervical symptoms and the treatment of the right shoulder condition provided a

good faith basis for questioning causation through the January-February 2015 time period.

Furthermore, Liberty Mutual's adjuster harbored the good faith impression that Wilson had not

committed to the right shoulder surgery.  Nonetheless, Liberty Mutual conveyed its willingness

to reevaluate the case if and when Wilson underwent the surgery.  Despite admitting that he had

the resources to fund the surgery, Wilson never proceeded with the procedure.  By December

2015, Wilson's right shoulder complaint had taken a back seat to his newly ascendent left

shoulder lipoma and impairment.  Given the delayed onset of the left shoulder symptoms and

Wilson's ongoing reticence to schedule the right shoulder surgery, the court finds that Liberty

Mutual did not act arbitrarily, capriciously, or without probable cause by failing to tender any

additional sums through trial.

26.

Accordingly, plaintiff is not entitled to an award for penalties, attorney's fees, or damages

as a result of Liberty's Mutual's alleged bad faith administration of his claim.

27.

Insofar as these findings of fact also constitute conclusions of law, they are adopted as

such.

## Conclusions of Law

### 1.

The court enjoys subject matter jurisdiction, via diversity, 28 U.S.C. § 1332.  Plaintiff is a citizen of Louisiana.  Defendant is a Massachusetts corporation, with its principal place of business in said state.  The amount in controversy exceeded $75,000, at the time of removal.[13] Venue is proper in the Monroe Division of the Western District of Louisiana.  28 U.S.C. § 1441(a).

### 2.

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211(1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938).  The parties in this matter implicitly agree that the disputed issues are governed by the substantive law of Louisiana.[14]  *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007) (deferring to the parties' agreement that Louisiana substantive law controlled); *Ace American Insurance Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832 (5th Cir. 2012) (applied Texas law where neither side disputed that Texas law applied); *Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1250 (5th Cir. La. 1997) (applied Louisiana law where no party disputed that Louisiana law governed).

---

[13]  Plaintiff sought policy limits, plus penalties and attorney's fees.

[14]  Both sides analyzed the claims pursuant to Louisiana law.

3.

Under Louisiana law, to obtain coverage under the uninsured motorist provision of a particular policy, the insured must establish that he is "legally entitled to recover" damages from the owner or operator of an uninsured or underinsured motor vehicle. *Hart v. Allstate Ins. Co.*, 437 So.2d 823, 828 (La.1983) (citation omitted).  In other words, the plaintiff must establish fault on the part of the uninsured motorist which gives rise to damages and prove the extent of those damages. *Id.* (citation omitted).  The insured must prove the extent of his loss and the cause of his loss by a preponderance of the evidence. *Rosen v. United Servs. Auto. Ass'n*, 104 So.3d 633, 639 (La. App. 4th Cir. 2012) (citations omitted).  "A preponderance of the evidence burden requires a plaintiff to show the fact sought to be proved is more probable than not." *Id.*

4.

General damages are damages which may not be fixed with any degree of pecuniary exactitude. *Anderson v. Welding Testing Lab., Inc.*, 304 So.2d 351, 352 (La.1974).  They contemplate such items as mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money. *Id.*  The trier of fact enjoys considerable discretion in fixing these damages. *Id.*

5.

Under Louisiana law,

a tort victim may recover past (from injury to trial) and future (posttrial) medical expenses caused by tortious conduct.  The victim must, however, establish he incurred past medical expenses in good faith as a result of his injury and future medical expenses will more probably than not be incurred.  A plaintiff shows the probability of future medical expenses with supporting medical testimony and

estimations of their probable cost.

*Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010) (internal citations omitted).

Thus, "[t]he proper standard for determining whether a plaintiff is entitled to future medical

expenses is proof by a preponderance of the evidence the future medical expense will be

medically necessary. *Id.* (citation omitted). Much discretion is accorded the trier-of-fact in its

assessment of general and special damages. *Id.*

6.

The weight to be accorded expert opinion evidence lies within the sole discretion of the

judge sitting without a jury. *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir.1977). While the

judge may not arbitrarily fail to consider such testimony, she is not bound to accept it. *Id.*

7.

Louisiana Revised Statute § 22:1892 (formerly § 22:658) provides that,

A. (1) All insurers issuing any type of contract . . . shall pay the amount of any
claim due any insured within thirty days after receipt of satisfactory proofs of loss
from the insured or any party in interest.

\*          \*          \*

B. (1) Failure to make such payment within thirty days after receipt of such
satisfactory written proofs and demand therefor . . . as provided in Paragraph[ ]
(A)(1) . . . of this Section . . . when such failure is found to be arbitrary,
capricious, or without probable cause, shall subject the insurer to a penalty, in
addition to the amount of the loss, of fifty percent damages on the amount found
to be due from the insurer to the insured, or one thousand dollars, whichever is
greater, payable to the insured . . . or in the event a partial payment or tender has
been made, fifty percent of the difference between the amount paid or tendered
and the amount found to be due as well as reasonable attorney fees and costs.

La. R. S. § 22:1892(A)(1) & (B)(1).

8.

Louisiana Revised Statute § 22:1973 (formerly § 22:1220) states that,

A. An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

        \*        \*        \*

B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A of this Section:

        \*        \*        \*

(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause

        \*        \*        \*

C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater . . .

La. R. S. § 22:1973.

9.

Courts have recognized that § 22:1892's prohibited conduct "is virtually identical to the conduct prohibited in [§ 22:1973]B(5):  the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause." *Maloney Cinque, L.L.C. v. Pac. Ins. Co., Ltd.*, 89 So.3d 12, 21 (La. App. 4th Cir. 2012). Furthermore, both of these statutes are penal in nature and must be strictly construed. *Id*.[15]

---

[15]  Plaintiff also asserted a claim for unfair trade practices under Louisiana Revised Statute § 22:1963.  However, there is no private cause of action for unfair trade practices under Louisiana Revised Statute §§ 22:1964, *et seq*.  *Watson v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, Civ. Action No. 14-1312, 2015 WL 5714635, at \*5 (E.D. La. Sept. 29, 2015) (citing *inter alia, Klein v. Am. Life & Cas. Co.,* 858 So.2d 527, 533 (La. Ct. App. 2003).  In any event, plaintiff did not establish that defendant engaged in any unfair trade practice in this matter.

10.

To recover statutory penalties under § 22:1892 , plaintiff must establish three elements: "(i) that the insurer received a satisfactory proof of loss, (ii) that the insurer failed to pay the claim within the applicable statutory period, and (iii) that the insurer's failure to pay was arbitrary and capricious." *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 368 (5th Cir.2009) (citations omitted).  A "satisfactory proof of loss," means that the insurer must "receive[ ] sufficient information to act on the claim." *Id*.

11.

Whether an insurer's action was arbitrary, capricious or without probable cause is an issue of fact to be determined by the trial court.  *Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104 (La. 2008).

12.

An insurer's conduct depends on the facts known to the insurer at the time of its action. *Louisiana Bag Co.,* 999 So.2d at 1114.  Penalties are not warranted  "when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Id*. (citations omitted).  Thus, when there is a "reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist." *Id.*  (citation omitted).

13.

Nonetheless, "proof of specific acts or proof of the insurer's state of mind is generally not required to establish conduct that is arbitrary, capricious or without probable cause." *Louisiana Bag Co., Inc*., 999 So.2d at 1121 (citations omitted).

14.

In *Lastrapes v. Progressive Sec. Ins. Co.*, the Louisiana Supreme Court held that an insurer did not act in bad faith by refusing to make an unconditional tender when it relied on its adjuster's opinion that reasonable minds could differ as to whether the physician's surgical recommendation related to the subject accident. *Lastrapes v. Progressive Sec. Ins. Co.*, 51 So.3d 659, 663 (La. 2010).  The adjuster's opinion was influenced by several factors, including:  1) the insured's failure to disclose an intervening accident to the physician; 2) a normal physical examination; 3) the physician did not expressly relate the surgery to the subject accident; 4) the adjuster did not believe that the MRI revealed the injuries diagnosed by the physician; and 5) increased frequency of treatment after the intervening accident.  *Id.*

15.

In diversity cases, state law governs the award of prejudgment interest.  *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994).  Pursuant to Louisiana Revised Statute § 13:4203, UM carriers owe interest on their policy limits from the date of judicial demand.  *Martin v. Champion Ins. Co.*, 656 So.2d 991, 995 (La. 1995) (citation omitted).

16.

Plaintiff is awarded $800.02 in prejudgment interest.[16]

---

[16]  Results of Calculations using Principal of $14,644.84:

2/26/2015 - 12/31/2015
$495.92
(309 days @ $1.60/daily @ 4.000%/year)

01/01/2016 - 07/08/2016
$304.10
(190 days @ $1.60/daily @ 4.000%/
year)

17.

Post-judgment interest on money judgments recovered in federal district court – including diversity cases – is governed by 28 U.S.C. § 1961(a).  *Fuchs v. Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir.1991) (citing *Nissho–Iwai Co. v. Occidental Crude Sales,* 848 F.2d 613, 622 (5th Cir.1988)).  Post-judgment interest accrues from the entry of judgment until the judgment is satisfied.  Post-judgment interest also is assessed against the pre-judgment interest award. *Boston Old Colony Ins. Co. v. Tiner Associates Inc.*, 288 F.3d 222, 234 (5th Cir.2002) (citation omitted).

18.

Post-judgment interest is awarded herein at the rate of 0.23 per day.  *See* 28 U.S.C. § 1961(a).[17]

19.

"Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party."  Fed.R.Civ.P. 54(d)(1).  A party need not prevail on all issues to justify an award of costs.  *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 713 F.2d 128, 131 (5th Cir.1983) (citation omitted).  Furthermore, "the decision whether to award costs ultimately lies within the sound discretion of the district court."

---

For a total of $800.02
https://www.lsba.org/Members/JudicialInterestRate.aspx

[17]  The weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment is .55 %.  *See* http://www.federalreserve.gov/releases/h15/current/.  Judgment and pre-judgment interest in the amount of $15,444.86  x .55 % annual Treasury yield / 365 days = .23 per day.

*Marx v. Gen. Revenue Corp.*, ___ U.S. ___, 133 S.Ct. 1166, 1172 (2013).

20.

Plaintiff partially prevailed on his claim.  Accordingly, the court awards plaintiff all *assessable* costs.  Plaintiff shall file a bill of costs (utilizing Form AO 133),[18] together with a supporting memorandum, with the Clerk of Court, in accordance with the procedures set forth in Local Rule 54.

21.

Insofar as these conclusion of laws also constitute findings of fact, they are adopted as such.

In Chambers, at Monroe, Louisiana, this 8th day of July 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

---

[18]  http://www.uscourts.gov/forms/other-forms/bill-costs-district-court